UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RIK IOF MILLENNIA BUCK PORTFOLIO, )<br>LLC, *et al*., )<br>　　　　　　　　　　　　　　　　　)<br>　　　　　Plaintiffs　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>　　　　　v.　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　)<br>BRANDEGEE GARDEN NY, LLC, *et al*., )<br>　　　　　　　　　　　　　　　　　)<br>　　　　　Defendants　　　　　　　) | Case No.: 1:25 CV 561<br><br>JUDGE SOLOMON OLIVER, JR.<br><br><br><br>ORDER |

Currently pending before the court in the above-captioned matter is Plaintiffs' RIK IOF Millennia Buck Portfolio, LLC, Lobo Feroz, LLC, and Jonathon Grossi's (collectively, "Plaintiffs" or "Movants") Motion for Partial Judgment on the Pleadings ("Motion"). (ECF No. 30.) For the reasons stated below, the court grants the Motion.

**I. BACKGROUND**

**A. Factual Background**

This case stems from three "Plaintiffs' investments in six low-income housing complexes in and around Utica, New York, collectively referred to as the 'Buck Portfolio.'" (*Id*. ¶ 2.) Plaintiffs RIK IOF Millennia Buck Portfolio, LLC ("RIK IOF") and Lobo Feroz, LLC ("Lobo Feroz") are both Ohio Limited Liability Companies, and Plaintiff Jonathan Grossi ("Grossi") is an individual residing in Florida. (Compl. ¶¶ 14, 16, 18.)

1. The Buck Portfolio

Around December 2016, Plaintiffs invested over $5,000,000.00 in the "Buck Portfolio," which is made up of "twelve separate limited liability companies that correspond to six apartment complexes." (*Id.* ¶¶ 4, 80.) These twelve limited liability companies ("LLCs") were formed on April 25, 2016, and consist of six LLCs which each own one apartment complex, plus their corresponding "Managing Member LLCs" (*id.* at PageID 3–5): Brandegee Garden LLC, and Brandegee Garden NY MM, LLC; Buck Apartments NY, LLC, and Buck Apartments NY MM, LLC; Cooper Apartments NY, LLC, and Cooper Apartments NY MM, LLC; Genesee Tower NY, LLC, and Genesee Tower NY MM, LLC; Knamm Apartments NY, LLC, and Knamm Apartments NY MM, LLC; and Village Point Apartments NY, LLC, and Village Point NY MM, LLC. (*Id*. at PageID 4–5, 7–12.) The LLCs own and manage the following apartment complexes: Brandegee Garden Apartments; Mary D. Buck Apartments; Lillian Y. Cooper Apartments; Genesee Tower; Margaret Knamm Memorial; and Village Point Apartments. (*Id*. ¶¶ 25, 33, 41, 49, 57, 64.)

2.      The Millennia Companies

Other than the Buck Portfolio, the remaining Defendants are: Millennia Housing Development, Ltd., Millennia Housing Management, Ltd., and Frank T. Sinito ("Sinoto"). (*Id*. at PageID 3–5.) The aforementioned apartment complexes in the Buck Portfolio are managed by Defendant Millennia Housing Management, which is part of "The Millennia Companies." (*Id*. ¶¶ 8, 10; Ans. ¶¶ 8, 10.) Sinito is the founder and CEO of "The Millennia Companies." (Compl. ¶ 8; Ans. ¶ 8.)

In recent years, the Department of Housing and Urban Development ("HUD") suspended these three Defendants, with proposed debarment, for "unauthorized transfers and underfunded security deposit accounts funds." (Compl. Ex. 10, HUD Letter at PageID 344–48.) Moreover, "on

October 23, 2024, federal agents executed a search warrant at Defendant Sinoto's home." (Compl. ¶ 104; Ans. ¶ 104.) HUD's Notice of Suspension revealed: "fourteen (14) HUD-insured or HUD-subsidized properties were materially underfunded as of April 30, 2023," and "sixteen (16) properties had unauthorized distributions or loans from January 1, 2022, to April 30, 2023." (HUD Letter at PageID 345–46.) None of these identified properties are in the Buck Portfolio. (*Id.*)

3.     Plaintiffs' Membership Interests and The Operating Agreements

As stated previously, Plaintiffs are brought together through their ownership interests "in each of the [LLCs] that own the apartment complexes at issue in this lawsuit." (Compl. ¶¶ 14–19.) Plaintiffs "collectively hold 50.1% of the membership interests in each entity that owns the apartment complexes." (*Id.* ¶ 81; Ans. ¶ 81.) More specifically, as to each LLC's membership interests: RIK IOF owns 24.9%; Lobo Feroz owns 20.2%; and Grossi owns 5%. (Compl. ¶¶ 15, 17, 19; Ans. ¶¶ 15, 17, 19.) Moreover, "[t]hat organizational structure is the same for all six apartment complexes." (Compl. ¶ 7.) For example:

> By way of illustration, one of the six Buck Portfolio apartment projects is known as Brandegee Garden Apartments, which is owned by Brandegee Garden NY, LLC. The managing member of Brandegee Garden NY, LLC is Brandegee Garden NY MM, LLC (which owns 49.9% of Brandegee Garden NY LLC); RIK owns 24.9%; Lobo owns 20.2%; and Jonathon Grassi owns 5%.

(*Id.* ¶ 6.) Upon "invest[ing] . . . over $5,000,000.00 in the Buck Portfolio," Plaintiffs were made members of each entity. (*Id.* ¶ 80; Ans. ¶ 80.) Thus, on December 29, 2016, each LLC's Operating Agreement was "amended . . . to provide for the withdrawal of [Millennia Housing Capital, LTD] as a member and the addition of Plaintiffs as members." (Compl. ¶¶ 22, 30, 38, 46, 54, 61.)

The Operating Agreements (or "Agreements") for all LLCs are identical in substance. (*Id.*

¶ 83; Ans. ¶ 83.) Most important to the instant Motion, they contain a "Put Rights" provision in Section 9.3, detailing the following contract option available to Plaintiffs:

> In the event that the Company has not sold or refinanced the Project on or before the third anniversary of the date hereof then the RIK Members can elect at any time to have the Company purchase all of the Interests then owned by the RIK Members . . . Members shall exercise this right under this Section 9.3 by giving written notice (the "Put Notice") to the Company. . . .

(Compl. Ex. 1–6, Operating Agreements § 9.3(a).) If exercising this option, Plaintiffs' Put Notice (or "Notice") must detail a Preferred Equity Amount (or "Put Purchase Price"), and closing date. (*Id*. § 9.3(a), (c).) The Agreements' Notice provision outlines that the Put Notice must be: "(a) personally delivered, or (b) sent by overnight or same day courier, or (c) sent by email." (*Id*. § 13.5.) Notice by personal service or courier is "deemed received and effective . . . on the date actually received." (*Id*. § 13.5(ii).) Notice by email is "deemed received and effective . . . on the date and time of transmission, provided that (x) such email is sent during customary business hours in Cleveland, Ohio, and (y) such notice is also sent by one of the other means . . . ." (*Id*. § 13.5(i).) Finally, the Agreements allow Defendants to object to the Put Purchase Price by "notify[ing] . . . in writing within ten (10) days of receipt of the Put Notice." (*Id.* § 9.3(b).)

4.     Plaintiffs' Attempt to Exercise Put Rights

The parties' dispute arose when Plaintiffs attempted to exercise their Put Rights. On July 22, 2024, Plaintiffs emailed Defendant Sinito, as well as Defendant Millennia Housing Development's Vice President, James Wells, and Defendant Millennia Housing Management's General Counsel, Renee Weiss. (Compl. ¶ 91; Ans. ¶ 91.) The email stated, in part: "This e-mail constitutes written notice given pursuant to Section 9.3 . . . that the RIK Members election [sic] to exercise the Put

Option with respect to each Company." (Compl. Ex. 7, Notice Email at PageID 332–33.) The email also specified a Put Purchase Price of $12,945,000, "for the aggregate RIK Members' interest across all six Companies," due upon "closing on the Put Option . . . on October 21, 2024 . . . ." (*Id*.) Furthermore, Plaintiffs "hand-delivered a hard copy of the Put Notice email to Millennia's offices," on August 1, 2024. (Compl. ¶ 93; Ans. ¶ 93.) Sinoto replied that he, "understood [Plaintiffs'] position, and . . . will review the attached and act accordingly." (Notice Email at PageID 332.)

On August 1, 2024, ten days after the Put Notice email, Plaintiffs sent a "follow-up" email, noting Defendants had not objected: "[t]en days have passed following the delivery of that notice and we have not received any confirmation or objection from the Companies regarding the . . . Put Purchase Price." (*Id*. at PageID 331.) The follow-up also reiterated the Put Purchase Price, and closing on October 21, 2024. (*Id*.)

Ten days before the closing date, on October 11, 2024, Plaintiffs sent another email referring to the Notice, in which they "indicated that they had learned of an offer to purchase the entire Buck Portfolio for $23,500,000." (Compl. Ex. 8, Email Chain from October 2024 at PageID 335–36.) The email encouraged Defendants to accept the offer, to help pay the Put Purchase Price:

> As you know, per our communication on July 22, the RIK Members in each of the Buck portfolio companies have exercised their put option . . . . The required payment on that put option, in the aggregate, is $12,945,000 on or before October 21, 2024. Acceptance of the offer and moving to an expeditious sale will generate proceeds necessary (together with additional equity) for Millennia satisfy [sic] the put option purchase price and avoid the need for further action to be taken by the RIK Members under the operating agreements.

(*Id*. at PageID 336.) Sinoto's reply on October 13, 2024, acknowledged the Put Purchase Price, and stated: "We are working on agreeing to an acceptable LOI. There is no additional equity to fund the

-5-

$12m. Should we have a call to further discuss?" (*Id.*) Replying on October 18, 2024, Plaintiffs reiterated the need for closing to take place at the price, and on the date, already discussed:

> [W]hile the sales proceeds of the Buck disposition may not be sufficient to satisfy our Put Option Purchase Price that is due on October 21, 2024, then per the operating agreement all proceeds of the sale first go to satisfy as much of the Put Option Purchase Price as possible before any other distributions. Every effort should be made to fulfill the Put Option Purchase Price as close to the due date as possible.

(*Id.* at PageID 335.) One day before closing, Sinoto "informed Plaintiffs that Defendants were refusing to pay the purchase price to satisfy Plaintiffs' Put Rights." (Compl. ¶ 98):

> As you know, we've been in a very difficult real estate market for a long time. This is a very good offer that we need to move forward with but please know we're not able to agree to the above. If we don't come to an agreement, we will lose the properties as the assets are in special servicing. We've carried these properties for a long time and like you, we need to receive our investment back and so does the other LP. There isn't any other equity from other sales to pay you. Given the real estate market conditions over the last 4-5 years, we're all fortunate to get our original investment back.

(Email Chain from October 2024 at PageID 335.) Defendants did not dispute receipt of the Put Notice, the Put Purchase Price, or payment due October 21, 2024. (*Id.* at PageID 335–36.)

### B.    Procedural History

On March 21, 2025, Plaintiffs filed their Complaint (ECF No. 1), initiating this lawsuit "to remedy a series of breaches of contract and other conduct by Defendants that have caused them harm." (Compl. ¶ 1.) On June 2, 2025, Defendants filed their Answer. (ECF No. 27.) Although the Complaint advances nineteen claims in total,[1] the instant Motion concerns only Plaintiffs' breach

---

[1]    The other claims are: Piercing the Corporate Veil (Count I); Tortious Interference by Defendants Sinoto, Millennia Housing Development, and Millennia Housing Management (Count VIII); Breach of Fiduciary Duty by Managing Member

-6-

of contract claims. In Counts Two through Seven, Plaintiffs' allege breach of contract by: Brandegee Garden NY, LLC (Count II), Buck Apartments NY, LLC (Count III); Cooper Apartments NY, LLC (Count IV); Genesee Tower NY, LLC (Count V); Knamm Apartments NY, LLC (Count VI); and Village Point NY, LLC (Count VII) (collectively, "Defendant LLCs.") (*Id.* at PageID 23–27.) Other than the difference in named LLC, the claims are identical. (*See id.*).

On June 13, 2025, Plaintiffs filed the instant Motion for Partial Judgment on the Pleadings. (ECF No. 30, Mot.) They seek judgment in their favor on their contract claims, and an award of $12,945,000, plus interest. (*Id.* at PageID 518–30.) On July 21, 2025, Defendants filed their Opposition. (ECF No. 35, Opp'n.) On August 4, 2025, Plaintiffs filed a Reply. (ECF No. 36.) The matter is now fully briefed and ripe for adjudication.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial[.]" A Rule 12(c) motion, "essentially constitutes a delayed motion under Rule 12(b)(6) and is evaluated under the same standard." *Kenyon v. Union Home Mortg. Corp.*, 581 F. Supp. 3d 951, 955 (N.D. Ohio 2022) (citation omitted). Accordingly, courts evaluate Rule 12(c) motions under the plausibility pleading standard, under which: "only 'well-pleaded factual allegations' that 'plausibly give rise to an entitlement of relief' and 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged' will survive." *Id.* (citation omitted). While there need not be "detailed

Defendants (Counts IX–XIV); Declaratory Judgment (Counts XV–XVI); "Accounting" as to "books and records of each Company LLC" (Count XVII); Fraudulent Transfer (Count XVIII); and finally, Civil RICO Violations pursuant to 18 U.S.C. § 1962, against Defendants Sinoto, Millennia Housing Management, and Millennia Housing Development (Count XIX). (*Id.* at PageID 21–23, 27–45.)

factual allegations" in the complaint, there must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ultimately, the court must determine whether, construing material allegations and drawing reasonable inferences in favor of the non-movant, "the moving party is entitled to judgment as a matter of law." *Kenyon*, 581 F. Supp. 3d at 955 (citation omitted).

The Rule 12(c) analysis has an additional "caveat," when "the plaintiff, as opposed to the defendant, moves for judgment on the pleadings." *United Food & Com. Workers, Loc. 1995 v. Kroger Co.*, 51 F.4th 197, 202 (6th Cir. 2022). When a plaintiff brings a Rule 12(c) motion, "'fact allegations of the answer are to be taken as true, but those of the complaint are taken as true only where and to the extent that they do not conflict with those of the answer.'" *Id*. (quoting *Bass v. Hoagland*, 172 F.2d 205, 207 (5th Cir. 1949)). Thus, the court "ask[s] 'whether the plaintiff's petition, stripped of those allegations which are denied by the defendant's answer, would leave the petition stating a cause of action . . . .'" *Id*. (citing 61A Am. Jur. 2d Pleading § 497). There "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

Furthermore, "[w]hile the allegations in the complaint are the primary focus in assessing a Rule 12(c) motion, 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account.'" *AIX Specialty Ins. Co. v. Big Limo, Inc*., 547 F. Supp. 3d 757, 761 (S.D. Ohio 2021) (alteration in original) (quoting *Barany–Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008)). In fact, "if a factual assertion in the pleadings is inconsistent with a document attached for support, the [c]ourt is to accept the facts as stated in the attached . . . ." *Williams v. CitiMortgage, Inc*., 498 F. App'x 532, 536 (6th Cir. 2012) (quotimg *Nat'l Ass'n of Minority Contractors, Dayton Chapter v. Martinez*, 248 F. Supp. 2d 679,

681 (S.D. Ohio 2002)).

### III. DISCUSSION

This Motion "seek[s] judgment in Plaintiffs' favor" on Counts II–VII. (Mot. at PageID 520.) Plaintiffs contend that "there is no actual dispute on the breach of contract claims," and, on those undisputed facts, they must prevail. (*Id.*) They assert: "[t]he well-pled allegations in the Complaint and the admissions and failures to deny in the Answer lead to but one conclusion: Plaintiffs are entitled to judgment in their favor . . . ." (*Id.* at PageID 520, 527.) In response, Defendants[2] argue Plaintiffs cannot establish they acted in breach of contract, and so are not entitled to judgment as a matter of law. (Opp'n at PageID 550–52.)

Judgment as a matter of law is only appropriate if the pleadings establish a breach of contract by Defendants. The operative contracts in this case are the LLCs' Operating Agreements (or "Agreements"). The parties agree all Operating Agreements are identical, (Mot. at PageID 523–24; Opp'n at PageID 549), and that this Motion concerns Section 9.3 therein—the Put Rights provision:

> 9.3    Put Rights.
>
> (a) In the event that the Company has not sold or refinanced the Project on or before the third anniversary of the date hereof then the RIK Members can elect at any time to  have the Company purchase all of the Interests then owned by the RIK Members and any of their Permitted Transferees. The RIK Members shall exercise their right under this Section 9.3 by giving written notice (the "Put Notice") to the Company. The Put Notice shall specify the date of closing, which shall be not earlier than ninety (90) days after the date of the Put Notice, and  the purchase price of the Interests subject to this Section 9.3 which shall be determined as  provided in Section 9.3(b) hereof.

---

[2]    Defendants Millennia Housing Development, Millennia Housing Management, and Frank T. Sinoto, are not parties to this Motion, as Counts II–VII are brought only against the Defendant LLCs. Accordingly, any mention of "Defendants" in general terms hereinafter refers only to the Defendant LLCs.

(b) The purchase price for the Interests of the RIK Members in connection with this Section 9.3 shall be the Preferred Equity Amount for the RIK Member, the Grassi Member, and the Lobo Member Interests. In the event that the Company objects to the Preferred Equity Amount set forth in the Put Notice, the Company shall notify the RIK Members of such objection in writing within ten (10) days of receipt of the Put Notice. If the parties are unable to agree on the Preferred Equity Amount then the RIK Members and the Company shall within five (5) days of such objection notice select an independent appraiser to make the determination of the fair market value of the property based on the criteria set forth above. The determination of the appraiser shall be final and binding on the parties hereto. Notwithstanding the foregoing, if the fair market value as determined by the appraiser is less than an amount that will cause the RIK Members to realize an amount equal to the greater of (i) a fifteen percent (15%) Internal Rate of Return on the RIK Members investment in the Company, and (B) an amount that will cause the RIK Members to realize a Multiple of Money of 1.4 (the "Minimum Amount") then the Preferred Equity Amount shall be the Minimum Amount. The fees and expenses of the appraiser shall be shared equally by the Company and the RIK Members.

(c) On the closing date, subject to the consent of the lender of the Senior Loan, the RIK Members and their Permitted Transferees shall convey, transfer and assign to the Company (by assignment and such other instruments of transfer as shall reasonably be requested by the Company) all of their Interests, free and clear of any liens, encumbrances or claims of any nature whatsoever and shall, to the extent requested by the Company, cooperate to effect a smooth and efficient continuation of the affairs of the Company. If the Company fails to comply with the terms of this Section 9.3 or close the purchase of the Interests of RIK Members and their Permitted Transferees in accordance with the terms hereof then the Company shall be in default hereunder and the RIK Members shall have the authority to market and sell the Project at the fair market value. The Company and the Managing Member will in good faith, and the Managing Member will cause its Affiliates, cooperate with the RIK Members in connection with and will facilitate the sale of the Project.

(Operating Agreements at PageID 69–70, 116–17, 163–64, 210–11, 257–58, 304–05.)

The parties also agree that all disputes arising from the Agreements are governed by New

York law, pursuant to their choice of law. (Compl. ¶ 85; Ans. ¶ 85.) Under New York law, breach of contract requires: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *DeMarle v. Videk, Inc.*, 678 F. Supp. 3d 353, 361 (W.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)). Here, the first element is established, as all "agree that the operating agreements for each Project created a binding agreement." (Opp'n at PageID 551.) As to the second element, although Defendants' Answer generally denies Plaintiffs' adequate performance under the contract, (*see* Ans. ¶ 124), they do not argue to this effect in their Opposition. Instead, Defendants argue: (1) Plaintiffs "have not asserted a breach," because failure to pay the Put Purchase Price is not a breach; and (2) even "[a]ssuming that the actions . . . are breaches," the only remedy for Plaintiffs is to "seek specific performance,"–*i.e.*, sale of the Project, "not damages." (Opp'n at PageID 548; *see also id.* at PageID 551–52.)

Accordingly, this Motion turns on the elements of breach and damages.

**A.      Whether the Pleadings Establish Breach of Contract As a Matter of Law**

The parties disagree as to what Defendants' contractual duties entail, and, consequently, whether their actions were in breach of contract. Plaintiffs allege that Defendants breached their obligations under the Operating Agreements, when they properly exercised their Put Rights, yet Defendants refused to pay the $12,945,000 Put Purchase Price. (Mot. at PageID 527–30; *see also* Compl. at PageID 23–27.) However, Defendants argue that Plaintiffs "have not asserted a breach," because they "overlook[] a fundamental issue that prohibits them from prevailing . . . [f]ailure to pay under the Put Rights is *not* a breach of any of the operating agreements." (Opp'n at PageID 547–48.)

1.      Whether the Agreements Impose on Defendants a Contractual Obligation to Purchase

Given Defendants' argument, a brief overview of Put Rights provisions is appropriate. Generally, Put Rights give a party an option to sell ownership interests or assets to another party who is required to purchase them, if the option is exercised, under terms previously agreed upon. *See, e.g.*, *In re TC Liquidations LLC*, 463 B.R. 257, 273 (Bankr. E.D.N.Y. 2011). One New York court described a typical sequence of events, which mirrors the process outlined in the Agreements in this case: "Once plaintiff gave notice of his intention to exercise his Put Right, the appraisal process was triggered, which would result in the determination of the value of his interest units, or the put purchase price. Within 30 days of the conclusion of the appraisal process, plaintiff was to tender his interest units in exchange for the put purchase price . . . ." *Karst v. W.P. Carey Inc.*, 69 N.Y.S.3d 272, 273–74 (2018); (*see also* Operating Agreement at PageID 69–70, § 9.3(a)–(c).)

Nonetheless, Defendants claim the Put Rights provision in this case operates differently, and does not impose a contractual obligation on them in the event the option is exercised. Specifically, they argue failure to perform under Subsections 9.3(a) and (b) is not a breach, because 9.3(c) provides for next steps if they "fail[] . . . to close the purchase" outlined in 9.3(a) and (b). (Opp'n at PageID 549.) The relevant portion of Section 9.3(c) states:

> . . . If the Company fails to comply with the terms of this Section 9.3 or close the purchase of the Interests of RIK Members and their Permitted Transferees in accordance with the terms hereof then the Company shall be in default hereunder and the RIK Members shall have the authority to market and sell the Project at the fair market value. The Company and the Managing Member will in good faith, and the Managing Member will cause its Affiliates, cooperate with the RIK Members in connection with and will facilitate the sale of the Project.

(Operating Agreements § 9.3(c).) Defendants rely on the final sentence, contending that:

-12-

"Defendants' obligations are simply to cause affiliates to cooperate with RIK Members in connection with and to facilitate the sale," ergo, they are only liable for breach if they fail to perform under 9.3(c). (*Id*.) Thus, Defendants argue, because "Plaintiffs do not allege that Defendants failed to cooperate with and facilitate the sale of the Project," they cannot establish breach of contract. (*Id.* at PageID 551.)

Plaintiffs describe Defendants' argument as "a gross understatement of Defendants' obligations." (Reply at PageID 555–57.) The court agrees. Subsection 9.3(c) gives Plaintiffs the right of sale if Defendants fail to perform, but that right is not inconsistent with the imposition of Defendants' contractual obligations under the preceding subsections (a) and (b). Defendants' position—that 9.3(a) and (b) are not enforceable terms—disregards Section 9.3's plain description of obligations. In fact, Defendants go so far as to state that it is "irrelevant" whether they "failed to comply with the terms of section 9.3," with regard to their failure to comply with the process outlined in 9.3(a) and (b). (Opp'n at PageID 548.) However, the court cannot deem express terms of a valid contract, "irrelevant."

To the contrary, the court must construe the Operating Agreement "'so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). Courts interpreting contracts must "keep[] with the 'plain meaning' of the contract's terms, and accord[] each [provision] independent weight, thereby giving full 'effect to all of its provisions.'" *Id.* at 207. Indeed: "'[u]nder New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" *Shaw Grp. Inc.*, 322 F.3d at 124 (citation omitted). Certainly, construing

-13-

contract terms in a manner that accords with one another is all the more important in a case such as this, where Defendants argue a term renders meaningless another term *within the same clause.*

Defendants ask the court to ignore express terms of the contract. It may not do so. Subsections 9(a) and (b) clearly outline the parties' obligations when the Put Rights Option is exercised. Moreover, Subsection 9(c) itself expressly states that the process of selling the Project is only triggered *upon* Defendants' breach of their contractual obligations—*i.e.*, if Defendants "*fail[]* *to comply with the terms* of this Section 9.3 or close the purchase of the Interests," which would mean they were "*in default* hereunder." (Operating Agreement at PageID 69–70 (emphasis added).) Despite Defendants' argument, the court finds that failing to complete the Put Rights Purchase would be a breach of their contractual obligations under the Operating Agreements.

2.      Whether Defendants' Breach is Established Based on the Undisputed Pleadings

The undisputed facts in the pleadings establish Plaintiffs' proper execution of their Put Rights option, and Defendants' subsequent failure to uphold their end of the bargain. As all parties agree, the Put Rights Provision mandates: "*if* Plaintiffs exercise the Put Right option, *then* the companies that own the apartment complex at issue *must* purchase Plaintiffs' interests in those companies on a specified closing date not earlier than 90 days after the date of the Put Notice." (Compl. ¶ 88 (emphasis added).)

First, the pleadings show Plaintiffs properly exercised the Put Rights option. Defendants "admit Plaintiffs emailed Mr. Sinoto, James Wells, and Renee Weiss on July 22, 2024." (Ans. ¶¶ 91; Compl. ¶ 91; *see also* Operating Agreements App. A (listing proper point of contact for each LLC as "Attn.: Frank Sinoto").) They also admit that, "[o]n August 1, 2024, Plaintiffs hand-delivered a hard copy of the Put Notice email to Millennia's offices." (Ans. ¶¶ 91, 93; Compl. ¶¶ 91, 93.)

-14-

Defendants do not deny the Put Notice identified the Purchase Price of $12,945,000 and the date of closing, and expressly stated: "This email constitutes written notice given pursuant to Section 9.3 of each Operating Agreement that the RIK Members election [sic] to exercise the Put Option with respect to each Company." (Ans. ¶¶ 91–92; Compl. ¶¶ 91–92.) They also do not dispute that this method of giving notice was valid and sufficient, (*see* Operating Agreements § 13.5), nor that they had "a ten day period to object in writing" to the Put Purchase Price. (Ans. ¶ 94; Compl. ¶ 94.) Defendants do not claim they objected, and, even if they did, the undisputed record reflects that no objection was made within the 10-day period. (*See* Notice Email; Email Chain from October 2024.) Thus, Plaintiffs properly exercised their Put Rights, and got no objection; thereby requiring Defendants to "purchase all of the Interests then owned by the RIK Members . . . ." (Operating Agreements § 9.3(a).)

The pleadings also demonstrate that Defendants failed to satisfy this requirement. Defendants do not deny that, "[u]nder the express terms . . . the deadline for Defendants to buy Plaintiffs' Interests in each of the Company LLCs was October 21, 2024." (Opp'n at PageID 551.) Yet, Defendants also "admit Mr. Sinito emailed Plaintiffs on October 20, 2024" and "informed Plaintiffs that Defendants were refusing to pay the purchase price to satisfy Plaintiffs' Put Rights." (Ans. ¶ 98; Compl. ¶ 98.) Finally, Defendants "admit that nothing has been paid pursuant to Section 9.3[,]" to date. (Ans. ¶¶ 97, 99; Compl. ¶¶ 97, 99.) Accordingly, the undisputed pleadings show Defendants failed to satisfy their contractual obligation.

Thus, Plaintiffs have established that Defendants breached the contract.

**B.  Whether the Pleadings Establish Damages As a Matter of Law**

Defendants also argue that, regardless of breach, the Agreements preclude Plaintiffs from

-15-

suing for damages. (Opp'n at PageID 548; *see also id.* at PageID 551–52.) They contend the Agreements "identify the remedy if the Put Rights are not paid," and suing for damages is *not* that stated remedy. (*Id.* at PageID 548.) Instead, according to Defendants, the "sole remedy" is: "[Plaintiffs] shall have 'the authority to market and sell the Project at the fair market value[,]' and the respective Company and Managing Member will cooperate with and facilitate the sale . . . ." (*Id.* (quoting Operating Agreement § 9.3(c).) Plaintiffs respond that this "wholly ignores an entire subsection . . . 9.3(a)—which expressly states . . . Plaintiffs '*can elect at any time to have the [Defendants] purchase all of the[ir] interests in the relevant assets.*'" (*Id.* at PageID 555 (alteration and emphasis in original); *see also* Mot. at PageID 523.) Plaintiffs' argument is well-taken.

1.      Whether Plaintiffs Can Sue for Damages Under the Operating Agreements

Just as the court cannot ignore express terms of the Agreements, neither can it read into them a term of exclusivity that is not there. As previously stated, the court must "keep[] with the 'plain meaning' of the contract's terms, and accord[] each [provision] independent weight . . . ." *LaSalle Bank*, 424 F.3d at 207. In addition, "[u]nder New York law, 'contractual remedies are deemed to be nonexclusive absent some indication of contrary intent.'" *Kahala Corp. v. Holtzman*, No. 10 CIV 4259 DLC, 2010 WL 4942228, at *2 (S.D.N.Y. Dec. 3, 2010). There must be "a clear indication that the parties intended contractual remedies to be exclusive," and "[a]s a general rule, it must clearly appear from the contract itself that the parties intended a provision to operate as a condition precedent." *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 245 (S.D.N.Y. 2020); *Kahala Corp.*, 2010 WL 4942228, at *2. *See also Mammoet*, 481 F. Supp. at 246 (collecting cases finding contracts did not create exclusive remedy). Here, the Operating Agreements do not contain any such indication. There is nothing showing the parties' intent to create an exclusive

-16-

remedy for breach. In fact, the permissive language that Plaintiffs "have the *authority* to market and sell," denotes the opposite. (Operating Agreements § 9.3(a) (emphasis added).)

Thus, the court finds Defendants' "attempt to read the contract to bar access to common law remedies for contract breach is unavailing." *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obshchestvo "Spartak"*, No. 13-CV-2303(ENV)(LB), 2016 WL 4532113, at *10 (E.D.N.Y. Aug. 29, 2016). The Agreements do not restrict remedies for breach, and Plaintiffs may seek damages.

2.      Whether Damages is Established Based on the Undisputed Pleadings

Additionally, the undisputed pleadings demonstrate Plaintiffs' damages necessary to prevail on their breach of contract claims. The parties do not dispute that the Agreements permit Plaintiffs to exercise Put Rights "at any time," and that, upon exercising that option, Defendants "shall" purchase their interests. (Operating Agreements § 9.3(a), (c).) Yet, as the court explained above, Defendants breached when they did not perform their end of the bargain under Subsections 9.3(a)–(b), admitting they refused to pay despite not objecting to the Put Purchase Price within the allotted time. (Ans. ¶ 99). Thus, but-for Defendants' breach, Plaintiffs were owed payment for transfer of their interests to the Company on the closing date. (Operating Agreements § 9.3(c).) This is enough for the court to conclude Plaintiffs suffered damages caused by Defendants' failure to perform. *See, e.g.*, *Wild Bunch, SA v. Vendian Ent., LLC*, No. 17 CIV. 1383, 2018 WL 1365690, at *5 (S.D.N.Y. Feb. 26, 2018) (quoting *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058, 2004 WL 1872421, at *5 (S.D.N.Y. Aug. 19, 2004)) ("whenever "'there is a breach of a contract or the invasion of a legal right, the law infers some damage.'"") Defendants were contractually obligated to pay, and did not do so. Accordingly, Plaintiffs have established the damages element.

In addition to the undisputed pleadings establishing the damages element of breach of

-17-

contract, the undisputed pleadings also permit the court's entry of damages in the specific amount sought by Plaintiffs. In their Motion, Plaintiffs asks the court "to enter judgment in their favor . . . and award [them] $12,945,000, plus interest," representing the Put Purchase Price. (Mot. at PageID 530.) The Put Notice identified that as the amount due for Plaintiffs' aggregate interest, reflecting the "greater of [Fair Market Value], a 15% [Internal Rate of Return] or a 1.4x [Multiple on Invested Capitol] after year 3 of the hold period," as specified in the Agreements. (Notice Email at PageID 332–33.) The Put Notice was attached as an exhibit to the Complaint, and so is incorporated into the Complaint. Defendants did not dispute this calculated Put Purchase Price in their Answer nor in their Response; rather, they admit receipt of the Put Notice, and otherwise state "the document speaks for itself." (Ans. ¶¶ 91–93.) In light of Plaintiffs identifying the Put Purchase Price as well as specifying how the Put Purchase Price was determined, without objection from Defendants, the court hereby determines Plaintiffs should be granted judgment on the pleadings in that amount.

Accordingly, the undisputed pleadings establish Plaintiffs are entitled to judgment in their favor as to their breach of contract claims, in the amount of $12,945,000.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Judgment on the Pleadings (ECF No. 30) is granted, and judgment is hereby entered in the amount of $12,945,000, plus interest.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 13, 2026

-18-